IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ELISHA MAXWELL, | ) | 4:05CV3178 |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM AND ORDER |
| vs. | ) | |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| Jo Anne B. Barnhart, Commissioner | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

The Social Security Administration denied the Claimant's application for disability

benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. ("Act") and Title

XVI of the Social Security Act, 42 U.S.C. § 1381, et seq., initially (December 9, 2002) and

on reconsideration (November 7, 2003).  After a hearing, an administrative law judge

("ALJ") determined on November 23, 2004,  the Claimant not to be disabled under the Act.

The appeals council of the Social Security Administration refused the Claimant's request

for review on May 18, 2005.   The Claimant now seeks judicial review of the ALJ's

determination, since it represents the final decision of the defendant, the Commissioner

of the Social Security Administration.

The Claimant contends that the ALJ's decision is incorrect for two reasons: 1) the

ALJ failed to accept as controlling the limitations and restrictions placed upon the Claimant

by the consulting medical expert, Dr. Gary Gard, Ph.D., who the ALJ found to be more

credible than the Claimant's treating psychiatrist pursuant to Social Security Ruling (SSR)

96-2p, and 2) the ALJ did not properly apply *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.

1984), when determining the credibility of the Claimant's subjective allegations of his

physical and mental condition as to his limitations, restrictions and work activity. The court has reviewed the record, the ALJ's evaluation and findings, the parties' briefs, the transcript, and the applicable law. The court concludes the ALJ's finding that the Claimant is not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record.

## BACKGROUND

The Claimant testified that he was born in 1965 and alleged that he became unable to work on January 1, 2002. Tr. at 364. He alleged disability due to brain damage, severe headaches, loss of use in his left arm, chest pain, and frequent episodes of falling asleep for short periods of time. *Id.*

The Claimant's earliest medical history dates back to 1998. On September 24, 1998, Claimant began treatment at Mid-East Nebraska Behavioral Healthcare Services after an arrest for driving while intoxicated. Tr. at 235-305. During his first evaluation, he reported being in good physical health and was taking no medication. Tr. at 290. He indicated that for leisure he enjoyed playing basketball, going fishing, watching movies, and grilling out. Tr. at 291. Claimant received partial care services related to alcohol abuse, and was discharged from treatment on August 29, 1999. Tr. at 235-36.

Authorities placed the Claimant in emergency protective custody on July 21, 2003, for suicidal ideation and depression. Tr. at 317-32. Claimant reported playing Russian roulette to treating physician, Dr. Loren Peterson, M.D., and stated that he would rather be dead. Tr. at 319. He complained of continuous headaches since age ten. Tr. at 319. On mental status examination, Dr. Peterson reported that Claimant had a "far-off stare" at times, but was cooperative and answered questions, although he had a hard time thinking. Tr. at 320. She noted that his thought process was goal directed and his judgment was

2

impaired.  *Id.*  He displayed limited intelligence and was oriented times three.  *Id.*  Dr. Peterson assessed depression disorder not otherwise specified, status post severe head injury, internal injuries, and left arm fracture and injury.  Tr. at 321.  Claimant had a global assessment of functioning (GAF) score of 25 to 30[1].  *Id.*  A CT scan of his head/brain was "essentially normal" and an electroencephalogram (EEG) was also normal.  Tr. at 326-27.

During a neurological examination performed by treating physician, Dr. C. Robert Adams, M.D., on July 22, 2003, Claimant was alert, oriented, and easy to talk to.  Tr. at 322.  Dr. Adams performed a motor examination that revealed symmetrical strength and the doctor observed that his coordination was "okay".  *Id.*  The doctor further noted that Claimant's sensation was symmetrical to vibration and touch and he had a positive Tinel sign across the wrist that was more striking on the left.  *Id.*

On Claimant's discharge on July 25, 2003, Dr. Peterson diagnosed chronic, enduring major depression secondary to long-standing head trauma at age ten, personality changes secondary to severe head trauma, and GAF of 35-40[2].  Tr. at 317.  Dr. Peterson advised Claimant to apply for Social Security disability.  *Id.*

Claimant underwent a consultative psychological evaluation with treating psychologist Dr. Julian Fabry, Ph.D., on August 4, 2003.  Tr. at 333-36.  Claimant complained of pain in his left arm, knee, and right shoulder as well as daily headaches.  Tr. at 333. On examination, Dr. Fabry noted that Claimant had significant problems with

---

[1]A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or an inability to function in almost all areas. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. Text Revision 2000)(DSM-IV-TR).

[2]A GAF of 31 through 40 is characterized by some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. See DSM-IV-TR at 34.

pronunciation of polysyllabic words and problems with parts of repetitive speech and language assessments, and he was only able to perform two-stage commands.  Tr. at 335. The doctor observed that Claimant's mood was "bland" and his affect ranged considerably during the evaluation.  *Id.*

Claimant reported lifelong difficulty sleeping and claimed that he sometimes went for three to four days without sleeping.  *Id.*  Dr. Fabry attempted to administer the Wechlser Memory Scale, but the Claimant only completed two subtests, the results of which suggested that "he was not very compliant".  *Id.*  The doctor reported that Claimant became upset because he either could not or would not complete the appraisals.  *Id.*  Claimant reported hearing voices, but could not state whether they were inside or outside of his head. Tr. at 336.  He also reported experiencing some visual hallucinations.  *Id.*  Dr. Fabry noted that Claimant had some insight into his difficulties, but his judgment was poor based on his recent behavior.  *Id.*  However, the doctor indicated that Claimant's display of poor judgment could be the result of some significant financial difficulties and Claimant's need to obtain disability benefits.  *Id.*

Dr. Fabry's diagnostic impressions were closed head injury at age ten; learning disorder, not otherwise specified; reading disorder; history of schizophrenia, paranoid type; dependent personality disorder; mental retardation (level unknown); and a GAF score of 55[3].  *Id.*  Dr. Fabry also completed a questionnaire after Claimant's examination.  Tr. at 337.  Dr. Fabry indicated that Claimant had no restriction of daily activities or difficulty maintaining social functioning, but did experience episodes of deterioration when stressed

---

[3] A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). See DSM-IV-TR at 34.

resulting in withdrawal from situations or exacerbation of symptoms, such as when he was hospitalized for "odd" behavior or suicidal threats. *Id.* He determined Claimant was able to sustain concentration and attention needed for task completion and was able to understand, remember, and carry out short and simple instruction. *Id.* The doctor also determined Claimant was able to relate appropriately to coworkers and supervisors and adapt to changes in the environment. *Id.*

On July 31, 2003, Claimant saw treating psychiatrist Dr. Mohammed Shoiab, M.D., for a psychiatric evaluation. Tr. at 344-45. Claimant reported he had had suicidal thoughts for years and was depressed, although his depression was better since he had been on medication. Tr. at 344. Claimant stated that he had been unable to work for the last eight months, citing aches and pains as well as inability to focus, but denied suicidal or homicidal thoughts at the time of the evaluation. *Id.* Claimant reported drinking "a couple of beers here and there" and indicated that he "[s]ometimes gets intoxicated". *Id.* On mental status examination, Dr. Shoiab found Claimant cooperative, goal directed, with mood "okay right now" and affect "appropriate," and concluded that Claimant had intact cognitive function, average intelligence, and fair to limited insight and judgment. *Id.* Dr. Shoiab's diagnosis included organic affective disorder, mental disorder due to head injury, and alcohol dependence with physiological disorder and a GAF of 51. *Id.* Dr. Shoiab advised the Claimant to avoid alcohol, and to continue with medications and supportive psychotherapy. Tr. at 345.

On August 7, 2003, Claimant was again seen by Dr. Shoiab. Tr. at 343-45. Claimant reported suicidal ideation for many years and difficulty sleeping. Tr. at 343. Blood testing revealed that Claimant was not taking Depakote as prescribed. *Id.* Dr. Shoiab reported Claimant was calm, had no signs of distress, and was in a good mood. *Id.* The

doctor noted that Claimant stated that he wanted to obtain disability benefits because he felt that he was unable to function.  *Id.*  He stated that when he worked, he became angry and had difficulty concentrating and focusing.  *Id.*  Dr. Shoiab instructed Claimant to take his medication and he increased his dosage of Zyprexa at night.  *Id.*  The doctor conducted a mental status exam that showed that Claimant had appropriate affect and no current suicidal ideation.  *Id.*  Dr. Shoiab indicated Claimant's impulse control was "fair," but he reported feelings of anger from time to time.  *Id.*  He noted that his attention span was "okay," his cognitive function was intact, and his intelligence appeared average.  *Id.*  The doctor further determined Claimant's insight and judgment were "fair to limited at times." *Id.*

In an August 28, 2003 follow-up, Dr. Shoiab reported Claimant was "doing well" on Zyprexa and Lexapro.  Tr. at 342.  Claimant reported occasional suicidal thoughts without any specific plan to kill himself.  *Id.*  Dr. Shoiab increased his dosage of Zyprexa and discontinued his Depakote because he had not been taking it.  *Id.*  On examination, the doctor observed Claimant was appropriate, cooperative, goal directed, and his mood was less depressed.  *Id.*  His affect was appropriate and he had no suicidal ideation or hallucination.  *Id.*  The doctor noted his impulse control was "fair," and his attention span was "okay".  *Id.*  His cognitive function was intact, his intelligence was average, and his insight and judgment were fair.  *Id.*

Claimant sought treatment at Columbus Family Practice for complaints of left arm pain on October 2, 2003.  Tr. at 348.  At that time, he was working at a swine company. *Id.*  Treating physician Dr. Andrea Bieganski, M.D., observed that his left arm seemed

6

weak on flexion, but not extension, and there was no atrophy of either arm. *Id.* The doctor opined that there was probably nothing physically wrong with Claimant. *Id.*

During a follow-up consultation on October 23, 2003, Dr. Shoiab reported Claimant was feeling depressed and not taking his medication. Tr. at 341. He failed to show up for follow-up as scheduled for two months. *Id.* Dr. Shoiab stressed the importance of medication compliance and Claimant indicated that his problem was taking his medication regularly. *Id.* The doctor noted that his mental status evaluation was essentially unchanged. *Id.*

A report by an unknown physician at the Good Neighbor Community Health Center in October 2003 indicates that Claimant sought medication for migraine headaches. Tr. at 354. He also complained of occasional blurred and double vision. *Id.* Claimant stated that he was not taking Depakote because he could not afford it. *Id.* Testing in November 2003 revealed increased liver function tests. Tr. at 352. Claimant was advised not to use excessive Tylenol or alcohol. *Id.*

On November 11, 2003, Dr. Shoiab completed a Mental Impairment Evaluation form. Tr. at 338-40. He indicated that Claimant's condition was serious and unpredictable depending on Claimant's response to medication. Tr. at 338. He indicated that it was "unknown" whether performance of Claimant's former job or similar work could have an adverse effect on his impairment. *Id.* Dr. Shoiab reported that any kind of mental stress could make Claimant's symptoms worse. *Id.* He indicated that treatment was available for Claimant's condition in the form of mood stabilizers. *Id.* Claimant's prognosis was "moderate." Tr. at 339. According to Dr. Shoiab, Claimant's reported symptoms included

feeling sad, suicidal thoughts, auditory hallucinations, racing thoughts, and difficulty sleeping, and he had a depressive affect.  Tr. at 340.

On February 27, 2004, treating physician Dr. Justin Mully, M.D., at the Good Neighbor Community Health Center examined the Claimant.  He noted Claimant was taking five or six Tylenol at a time and drinking heavily several times a week.  Tr. at 349-50.  The doctor instructed Claimant to use no alcohol or only use in moderation, to use no more than two Tylenol at a time, and to follow-up as needed.  Tr. at 349.

At the administrative hearing, held on August 30, 2004, Claimant amended his disability onset date to December 9, 2002.  Tr. at 364.  He stated that he continued to work, but not at the substantial gainful activity level required by Title II of the Act.  *Id.* Claimant testified that he was 39 years old and stopped attending high school in the eleventh grade.  Tr. at 369.  He took both regular and special education classes.  Tr. at 370.  Claimant testified that he had a plate in his head after having surgery in 1975.  *Id.* Claimant had a six-year-old child and his wife was pregnant.  Tr. at 372.  He testified that he could not keep a job because of his limited work efforts and problems with attendance.  Tr. at 374.  He had worked in construction, as a janitor, an in meat packing.  *Id.*  He had worked as a cook at several restaurants and had also worked building tractor trailers for a period of over three years.  Tr. at 375-76.  He lost most of his jobs due to attendance issues.  Tr. at 379.

He started working at his current job as a part-time cook in October or November 2003.  *Id.*  Claimant was working 25 to 30 hours a week.  Tr. at 380.  He worked 7 to 8 hours a day 3 to 4 days a week.  *Id.*  Claimant did not receive any mental health treatment

as an adult prior to his hospitalization for suicidal ideation.  Tr. at 382.  Claimant stated he had two or three DWI convictions and spent 84 days in jail in 2003.  Tr. at 383-84.

Claimant reported difficulty getting along with coworkers and sometimes had to leave the workplace.  Tr. at 387.  He stated that he suffered from daily headaches caused by his head injury which affected his motivation, focus, and concentration.  Tr. at 388.  Although Claimant reported suffering from severe headaches since his accident in 1975, there is no medical evidence to support his claim.  Claimant also reported left elbow pain that limited his ability to straighten it, lift heavy objects, or grip.  Tr. at 390-92.  During the day, Claimant helped with dishes and chores around the house, spent time with his six-year-old son, and helped him mow the lawn.  Tr. at 395.  He also rode his bike with his son every day.  Tr. at 398.

Dr. Gary Gard, M.D., consulting medical expert, testified that Claimant's mental impairments resulted in mild restriction of daily activities, moderate limitation of social functioning, moderate difficulty maintaining concentration, persistence or pace, and no episodes of decompensation in the previous year (late 2003 through November 2004).  Tr. at 406-08.  Dr. Gard opined that Claimant would be capable of sustaining routine, repetitive, unskilled work.  Tr. at 409.

The Vocational Expert ("VE") testified that a person of Claimant's age, education, work experience, and residual functional capacity ("RFC"), could perform routine, repetitive unskilled work at the light and medium exertional level with ordinary supervision, minimal social contact and superficial social interaction.  Tr. at 416.  His past relevant work as a janitor and his present work as a cook's helper  would fall within his RFC.  *Id.*  The VE stated the Claimant could also perform sedentary, unskilled work.  Tr. at 418.

9

ALJ's DECISION

A disability is defined as the "inability to engage in any substantially gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423 (D)(1)(A); 20 C.F.R. § 404.1505. A Claimant is considered to be disabled when the Claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantially gainful work which exists in [significant numbers in] the national economy...." 42 U.S.C. § 432 (D)(2)(A).

The ALJ evaluates a disability claim according to a five step sequential analysis prescribed by Social Security regulations.  The ALJ examines

> any current work activity, the severity of the Claimant's impairments, the Claimant's residual functional capacity and age, education and work experience. *See* 20 C.F.R. § 404.1520(a); *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984). If a Claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the Claimant will be determined disabled without considering age, education, or work experience. *See Braswell*, 733 F.2d at 533. If the Commissioner finds that the Claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the Claimant retains the residual functional capacity to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). A Claimant's residual functional capacity is a medical question. *See id.* at 858.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).

Using this analysis, the ALJ concluded that the Claimant is not disabled within the meaning of the Social Security Act.  Tr. at 17.  The ALJ found that the Claimant had intermittently engaged in substantially gainful activity since his alleged onset date,

December 9, 2002.  Tr. at 26.  The ALJ further found that the combination of the following impairments is severe under the Act and regulations: depression, a post traumatic stress disorder, headaches, left carpal tunnel syndrome and drug and alcohol abuse.  Tr. at 20. The ALJ determined that the Claimant has not contended that his medically determinable impairments meet the "listings," and the record contains no evidence which would support such a finding.  Tr. at 20.

Finally, the ALJ determined that the Claimant's allegations of a complete inability to work is not credible.  Tr. at 25.  The Claimant has been non-compliant in the past with regard to taking his medication and continues to abuse alcohol.  Tr. at 24.  He appeared to minimize his use of alcohol in his testimony at the hearing and in his report to the psychological consultative evaluator, Dr. Fabry.  *Id.*  Initially, at the hearing, he told the ALJ that he had not used alcohol since his hospitalization in July 2003.  *Id.*  Later, he indicated that what he meant was he had not been "intoxicated" and that he only drinks a 12 pack. *Id.*  The records showed that he is drinking heavily several times a week.  *Id.*  He has two or three DUIs and spent 84 days in jail, apparently related to one of these charges.  *Id.*

The ALJ noted Claimant also appears to exaggerate his left arm limitations.  *Id.*  The accident occurred when he was ten years old and, subsequent to the accident, he has been able to work all of his adult life (20 years) at jobs which included jobs in the medium to heavy level of work activity.  *Id.*  The primary care notes from 2002 make no mention of headaches, chest pain, or arm difficulty.  *Id.*  His activities of daily living include some meal preparation, dishes, laundry and lawn work.  *Id.*  The Claimant reported that his six-year-old son helps him mow the lawn by pushing the mower and that this activity allegedly takes up to five hours.  *Id.*  His only medications were Tylenol  or aspirin.  *Id.*  The ALJ noted

consulting physician, Dr. A. R. Hohensee, M.D., thought Claimant's headaches might be affected by alcohol and marijuana use.  *Id.*

In her analysis, the ALJ further noted that the Claimant amended his onset date to the time when his earnings dropped below the substantial gainful earnings level, but he has worked continuously during the pendency of this claim.  *Id.*  He is currently working part-time as a cook 30 hours per week at a job that is defined as medium level work activity.  *Id.*  In this job, at a community college, he is able to interact with students.  *Id.*  In fact, he has been able to perform this job intermittently at above the significant gainful work activity level.  *Id.*  The Claimant failed to provide pay stubs from his current employer.  *Id.*

The consulting medical expert, Dr. Gard, opined at the hearing that the Claimant could work on a full-time basis.  *Id.*  He testified that he does not agree with Dr. Shoiab, the treating psychiatrist's opinion that the Claimant would have frequent problems with concentration.  *Id.*  Dr. Gard opined that the Claimant would have only moderate limitations on his ability to concentrate and he could sustain repetitive unskilled work on a full-time basis.  The ALJ determined the Claimant possesses the residual functional capacity to perform his past relevant work as well as his current work and he cannot be disabled pursuant to 20 C.F.R. 404.1520(f) and 20 C.F.R. 416.920(f).

LEGAL STANDARD

When reviewing the decision not to award disability benefits, the district court does not act as a fact finder or substitute its judgment for the judgment of the ALJ or the Commissioner.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole.  *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996).

"Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision." *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (*citing Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)). In determining whether the evidence in the record is substantial, the court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). If the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision either "because substantial evidence exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (citations omitted). The court may, however, "reverse the administrative determination on the ground of unreasonableness." *Bradley v. Bowen*, 660 F. Supp. 276, 279 (W.D. Ark. 1987) (*citing Gavin v. Heckler*, 811 F.2d 1195, 1199-1201 (8th Cir. 1987), *and Deuter v. Schweiker*, 568 F. Supp. 1414 (N.D. Ill. 1983)).

## DISCUSSION

### A. Weight Afforded to Medical Expert's Diagnosis

The ALJ found that "the Claimant is not entitled to a period of disability or to the payment of disability insurance benefits under Title II of the Social Security Act." Tr. at 25. Based on the similarity of the first two issues in this case, the court will be addressing them together. The Claimant contends it was error for the ALJ to afford "greater weight" to the opinion of the medical expert, Dr. Gard, but not include all of the limitations indicated by the medical expert in her final RFC determination, pursuant to Social Security Ruling (SSR) 96-2p. Filing No. 11, Plaintiff's Brief, at 10.

13

It is the responsibility of the ALJ to determine the Claimant's residual functional capacity based on all of the relevant evidence.  20 C.F.R. §§ 404.1545 and 416.945.  In this case, the ALJ properly considered all relevant medical evidence of the record.  The ALJ did not give significant weight to the checklist filled out by the treating psychiatrist, Dr. Shoiab, because the doctor only saw the Claimant on a few occasions and it was filled out after only two months of treatment.  Tr. at 24.  The ALJ afforded greater weight to the opinion of the medical expert, Dr. Gard, than the treating psychiatrist.  *Id.*  The Claimant contends that the ALJ then failed to adopt all of the opinions of Dr. Gard in arriving at her RFC.  Filing No. 11 at 12.  He claims that the ALJ disregarded the moderate limitations in function opined by the medical expert and simply substituted her own unqualified opinion for the medical opinion of the expert.  *Id.*  The Claimant further contends that the ALJ failed to list all of the limitations stated by the medical expert when posing a hypothetical question to the Vocational Expert.  *Id.* at 13.

Claimant argues that the ALJ stated that she afforded "greater weight" to the opinion of Dr. Gard than Dr. Shoiab but she did not indicate that she was adopting or affording controlling weight to Dr. Gard's opinion.  Tr. at 25.  Rather, the ALJ specifically adopted the opinions of the state agency reviewing psychologists, not Dr. Gard, because they were consistent with the evidence as a whole.  *Id.*  "It is the ALJ's function to resolve conflicts among the various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the Claimant or the government, if they are inconsistent with the record as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)(citations omitted).

14

The court concludes that the ALJ properly considered all relevant medical evidence of the record. Upon review of the transcript from the hearing, it is evident that the ALJ questioned the medical expert regarding his findings of limitation of function and specifically asked him to define his use of the rating "moderate" within a rating scale of "no limitation, mild, moderate, marked, or extreme". Tr. at 406-12. Dr. Gard defined his use of the rating "moderate" to mean a limitation that would not preclude the Claimant from working but would be an area of deficit that would cause him some difficulty. Tr. at 411. Dr. Gard further testified that he believed the Claimant was capable of sustaining routine, repetitive, unskilled work without any special supervision and could sustain minimal social contact with co-workers, supervisors, or the public. *Id.* at 410-12. He also opined that the Claimant could work in his current capacity as a cook's helper on a full-time basis. *Id.*

In addition, Dr. Gard disagreed with Dr Shoiab, the treating psychiatrist's opinion that the Claimant would have frequent problems with concentration, partly because the treating psychiatrist had contradicted himself in an earlier diagnosis which stated that the Claimant's concentration was "okay" and because the Claimant was non-compliant with any testing of his memory, attention, and concentration. Tr. at 409. Dr. Gard found that the Claimant would be only moderately limited in his ability to maintain attention and concentration (Tr. at 411) and four consulting psychologists reported similar findings in the record. Tr. at 201, 232, 337.

The ALJ determined that the Claimant had the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently, and stand, walk and sit for six hours in an eight hour day, with normal breaks. Tr. at 26-27. He should avoid constant use of his left arm but he could use it frequently. *Id.* He could frequently perform all

15

postural activities such as balancing, stooping, crouching and crawling, but he should not work on ladders or scaffolds and should avoid concentrated exposure to vibrations.  *Id.* There is some question of carpal tunnel syndrome so he should not be required to use his left hand on more than a frequent basis, and he should avoid constant, repetitive work with the left non-dominant hand.  *Id.*

The Claimant further reported that he rode a bicycle with his son every day, spent five hours mowing the lawn, performed light household chores, and played with his son on a regular basis.  Tr. at 398. The ALJ also determined that the Claimant often failed to take or even purchase his prescribed medications and he continued to abuse alcohol even after he was advised of increasing liver damage and its limiting effects on his anti-depressant medications.  Tr. at 344, 349-50, 352.  It is important to note that "when an impairment can be controlled by treatment or medication, it cannot be considered disabling."  *Wardford v. Bowen*, 875 F.2d 671 (8th Cir. 1989).  "Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits."  *Roth v. Shalala*, 45 F.3d 279 (8th Cir. 1995).

It appears that Dr. Gard's functional capacity evaluation of the Claimant proved consistent with the ALJ's decision that the Claimant is not disabled within the meaning of the Act.  Therefore, Dr. Gard's opinion that the Claimant is only moderately limited in his ability to function socially and maintain concentration, persistence, and pace and is capable of sustaining routine, repetitive, unskilled work is consistent with the ALJ's decision.  The court finds that the ALJ's decision, in this regard, is supported by substantial evidence.

**B. Credibility of Claimant's Subjective Allegations**

16

The Claimant contends the finding is in error because the ALJ failed to follow the *Polaski* standard in evaluating the credibility of Claimant's subjective allegations of his physical and mental condition. The standard, in the Eighth Circuit, for evaluating a Claimant's subjective complaints in Social Security cases is *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  According to the Eighth Circuit, an ALJ may not disregard a plaintiff's subjective complaints solely because the objective medical evidence does not fully support them:

> Absence of objective medical basis supporting the degree of severity of disability Claimant's subjective complaints alleged is just one factor to be considered in evaluating credibility of testimony and complaints; [ALJ] must give full consideration to all of the evidence presented relating to subjective complaints, including the [plaintiff's] prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1.     the [plaintiff's] daily activities;
> 2.     the duration, frequency and intensity of the pain;
> 3.     precipitating and aggravating factors;
> 4.     dosage, effectiveness and side effects of medication;
> 5.     functional restrictions.
>
> The [ALJ] is not free to accept or reject the [plaintiff's] subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the record as a whole.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (emphasis in original).  "Pain is recognized as disabling when it is not remedial and precludes Claimant from engaging in form of substantial gainful activity; mere fact that working may cause pain or discomfort does not mandate finding of disability."  *Cruse v. Bowen*, 867 F.2d 1183, 1183 (8th Cir. 1989).

"While the ALJ may not discount a social security disability Claimant's complaints solely because they are not fully supported by objective medical evidence, a Claimant's

17

complaints may be discounted based on the inconsistencies in the record as a whole." *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005).  "Allegations of disabling pain made by Claimant seeking social security disability benefits may be discredited by evidence that Claimant has received minimum medical treatment and/or has taken only occasional pain medication."  *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir. 1998).

The Claimant's subjective allegations of his physical and mental condition are inconsistent with objective tests, his medical history, his past work experience, and the nature of his disorder, as previously set forth herein.  The ALJ properly considered inconsistencies between the Claimant's subjective complaints and the objective medical evidence, combined with the Claimant's daily activities, medical treatment and medication and determined that the extent of the Claimant's complaints to not be credible.  After carefully reviewing the evidence, the court agrees.

## CONCLUSION

Accordingly, the court concludes that the ALJ's findings that the Claimant is not disabled within the meaning of the Social Security Act is supported by substantial evidence in the record as a whole.  The defendant's decision is affirmed.

IT IS, THEREFORE, ORDERED that the final decision of the defendant, the Commissioner of the Social Security Administration, is affirmed.

DATED this 22nd day of September, 2006.

BY THE COURT:

s/Joseph F. Bataillon
Chief U.S. District Court Judge

18